**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Francisco CORRAL–IBARRA and Roberto Herrera, Defendants– Appellants.**

**Nos. 91–3036, 91–3093.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1994.

Decided May 23, 1994.

**432**

David E. Risley (argued), Rodger A. Heaton, Asst. U.S. Atty., Office of the U.S. Atty., Springfield, IL, for U.S.

Elliott T. Price (argued), Chicago, IL, for Francisco Corral–Ibarra.

James E. Elmore (argued), Elmore & Reid, Springfield, IL, for Roberto Herrera.

Before CUMMINGS, ESCHBACH, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Francisco Corral–Ibarra ("Corral–Ibarra") and Roberto Herrera ("Herrera") each of one count of conspiracy to distribute cocaine and one count of attempted possession with the intent to distribute cocaine. 21 U.S.C. §§ 841(a)(1) and 846. Herrera appeals both his conviction and sentence, while Corral–Ibarra appeals only the latter. We affirm.

I.

The events giving rise to appellants' drug convictions ironically have their genesis in the efforts of another drug dealer, James Timothy McEwen ("McEwen"), to *get out of* the cocaine business before he got caught and went to jail. At some point during his three-year stint as a cocaine dealer, McEwen made the acquaintance of John Castellanos ("Castellanos"), a Chicago cocaine dealer who soon became McEwen's primary source, selling him up to one kilogram at a time. By 1990, McEwen had decided to abandon his drug business because it was "out of control" and he feared prosecution. Nevertheless, Castellanos continued calling McEwen with offers to sell more cocaine. On June 6, 1990, McEwen finally went to the Illinois State Police, telling an agent of his long-term dealings with Castellanos and of Castellanos' recent offer to sell him a kilogram of cocaine. McEwen immediately entered into a cooperation agreement with the federal Drug Enforcement Agency ("DEA"), the terms of which granted him immunity.

Later that day, with DEA's assistance, McEwen began taping his phone conversa-

tions with Castellanos. When McEwen inquired about the availability of one kilogram of cocaine, Castellanos complained about the low supply and high prices in Chicago. Castellanos then turned the tables on McEwen, asking if McEwen could arrange a large purchase from McEwen's Florida source.[1] After a series of conversations in which Castellanos expressed interest in obtaining 300 or more kilograms per week, McEwen scheduled a meeting between Castellanos and the Florida source for the following day at a hotel in Springfield, Illinois. Castellanos indicated that he would be accompanied by one of his "uncles".

The meeting took place as scheduled on June 7, with McEwen, Castellanos, Corral–Ibarra, and DEA Agent John Schaefer ("Schaefer"), posing as the Florida cocaine source, in attendance. Under the watchful ear and eye of the government's audio- and video-taping devices, the parties discussed the sale of large quantities of cocaine. Specifically, Castellanos acted as the translator for Corral–Ibarra in negotiating price, quantity, quality, credit terms, and delivery point. By the end of the day, Castellanos and Corral–Ibarra had agreed to purchase 50 kilograms of cocaine from Schaefer for $17,000 per kilogram, for a total of $850,000.

After the initial meeting, Schaefer dealt directly with Castellanos in finalizing the deal. Schaefer insisted on using a "show and show" method of exchange. Under this arrangement, Schaefer agreed to move the cocaine as far north as Quincy, Illinois, where an agent for Castellanos and Corral–Ibarra could view and test the cocaine. At the same time, Schaefer would send an agent to the Chicago area to view the money. If both parties were satisfied, Schaefer then would transport the cocaine to Chicago for the actual exchange. Castellanos agreed to this type of transaction, and initially indicated that he would travel to Quincy. Later, however, Castellanos informed Schaefer that a man named Roberto (who turned out to be defendant Roberto Herrera) would view the cocaine.

Castellanos and Schaefer later discussed Herrera's role in the transaction. Castellanos told Schaefer to "show him one of the carburetors,[2] you know just show it to him, he thinks he is going to bring one carburetor to show it to us.... He doesn't imagine what, you know, what's going on, right?" Throughout the conversation, Castellanos emphasized time and again that Schaefer should only show Herrera a small amount of cocaine because "he'd freak on you" if he knew how many kilograms were involved. Castellanos also commented that Herrera is "the innocent type dude." Schaefer then expressed concern over Herrera's presence in Chicago when the entire delivery would be unloaded. Castellanos assured Schaefer that there was nothing to worry about because Herrera "doesn't know nothing."

In a later recorded telephone conversation, Castellanos again told Schaefer to show only two kilograms to Herrera. Schaefer expressed some concern that people on Castellanos' end of the deal might balk because their tester had examined only two kilograms, but after discussing the quality of the cocaine, Castellanos reiterated that there would be no need for Herrera to view more than two kilograms.

In final preparation for the transaction, Schaefer arranged for 50 kilograms of previously seized cocaine to be flown to Springfield on a DEA airplane, and then transported to a large houseboat, equipped with audio- and video-tape machinery, that was docked on the Mississippi River at Quincy. On June 15, Herrera flew to Quincy and checked into a local motel. Castellanos and Schaefer again spoke by telephone, at which time Castellanos told Schaefer the name of Herrera's hotel and his room number. Schaefer then reminded Castellanos that Herrera would be travelling to Chicago with the sellers after the "show and show" took place. The following exchange ensued:

---

1. In prior dealings with Castellanos, McEwen had referred to a fictitious alternate source in Florida in an effort to keep Castellanos' prices low.

2. The parties do not dispute that Castellanos used the word "carburetor" as a cryptic reference to a kilogram of cocaine.

CASTELLANOS: Yeah, but don't tell him anything about nothin'.

SCHAEFER: Hey, why don't you want him to see this man, are you that, I mean is he just not cool or what?

CASTELLANOS: He's cool, except we don't, he'll get paranoid on ya man.

SCHAEFER: And he ain't used to all that right?

CASTELLANOS: Ah, man, he's never even seen what you're gonna show him.

Later in the conversation, Schaefer confirmed, saying, "You just don't want, you only want him to see two." Castellanos replied, "Yeah, cause ya know, he'll, he'll freak out on ya man, he'll get scared."

Schaefer then met Herrera at the hotel and drove him to the dock area. As they boarded the boat, Herrera appeared nervous. Once on the boat, one of the waiting agents handed Herrera two kilogram packages of cocaine. Herrera told the agent to cut open the package. Initially, the agent declined (because of agency policy constraints), and informed Herrera that he would have to talk to Schaefer. The following exchange then took place:

HERRERA: That's what they told me. Cut it, test it, give them a call.

SCHAEFER: How you supposed to test it?

HERRERA: Frank, Frank

SCHAEFER: How you supposed to test it?

HERRERA: Frank and, un (unintelligible), Frank and Johnnie asked me

SCHAEFER: Okay, how you, how you are supposed to test it?

HERRERA: Just rip it up like that. (Unintelligible) This, this is just a sample, okay? Then cut it, rip it, taste it, good, then call, if not worth it, don't even bother to bring it over.

Schaefer then gave permission to cut open a package. Herrera had no knife, so Agent Rick Miller handed Herrera his knife. When Herrera experienced difficulty opening the package, however, Miller took back the knife and cut the package open. Herrera dabbed his finger in the package and, after placing some of the cocaine on his tongue, nodded his head in approval, saying, "You can call him."

Herrera and Schaefer then left the houseboat to find a pay telephone which Herrera used to page Castellanos. When Castellanos returned the page, Herrera spoke to him in Spanish, which Schaefer did not understand. Herrera then handed the receiver to Schaefer. Castellanos again reminded Schaefer not to show Herrera the entire load of cocaine because Herrera "would freak if he saw them all." Schaefer informed Castellanos that Herrera had seen just two kilograms. Schaefer also told Castellanos that a sellers' representative (who turned out to be DEA Agent Humberto Flores ("Flores")) would be contacting Castellanos soon to view the money.

Schaefer and Herrera then returned to the houseboat. While the sellers ostensibly waited for instructions to proceed to Chicago with the drugs, Agent Miller engaged Herrera in the following conversation:

MILLER: You ever been on a deal like this?

HERRERA: No, not this big. I know a, what you call it. I know about this shit, I just, I just like doin' it too much.

MILLER: Probably don't know, probably don't know what's happening right now do you?

HERRERA: Oh yeah. Well no, I don't know, I don't know what they've got planned. All I know is like straight to Chicago, that's it.

MILLER: We all got our jobs to do.

HERRERA: That's what it's all about.

MILLER: You don't think they really flew you all the way down here for two though, do ya?

HERRERA: I ain't that ignorant.

Meanwhile, Flores met with Castellanos and Corral–Ibarra in a hotel room (also amply equipped with tape machinery) in Schiller Park, Illinois. Corral–Ibarra informed Flores that he had only been able to raise $500,000, and Castellanos suggested that the sellers provide an initial 30 kilograms with the balance to be paid for and delivered in a few days. When Flores asked to see the money, Castellanos and Corral–Ibarra took a

large wastebasket down to their car and returned with $481,115 in United States currency. After Flores saw the money, Castellanos and Corral–Ibarra were arrested by awaiting agents.

Herrera then was arrested on the houseboat. He waived his *Miranda* rights and spoke with the agents. He said that Castellanos had hired him to travel to Quincy and escort some people back to Chicago. He also claimed that once he arrived in Quincy he received instructions over the telephone to taste the cocaine and to let Castellanos know whether it was of good quality. He said that Castellanos had promised to take care of him, and that he expected to be paid three or four thousand dollars.

Castellanos, Corral–Ibarra, and Herrera each were charged with one count of conspiracy to possess with the intent to distribute cocaine and with one count of knowingly and intentionally attempting to possess with the intent to distribute cocaine. Castellanos pleaded guilty to both counts on June 11, 1991.

At trial, Corral–Ibarra presented one trial witness who testified that Corral–Ibarra was an employee in his landscape business, earning $400 per week, while Herrera presented no evidence. The government argued that both defendants were actual members of the conspiracy, but that even if Herrera had not been an actual member, he aided and abetted the conspiracy. Corral–Ibarra's attorney countered that his client had been entrapped. Herrera's attorney argued that there was insufficient evidence of the necessary elements on the conspiracy charge and entrapment on the charge of attempting to possess with intent to distribute. At the close of evidence, the district court instructed the jury on both aiding and abetting and entrapment. The jury returned a guilty verdict against both defendants on both counts, and the district court denied defendants' timely motions for a new trial.

The court sentenced Corral–Ibarra to 293 months in prison and Herrera to 212 months in prison. The court followed the probation office's recommendation that the defendants not receive a two-level reduction for acceptance of responsibility. The court accepted the defendants' objection (supported by the United States Attorney's Office) that they should be held accountable for 50 kilograms, rather than the 790 kilograms suggested by the probation office, because any references to higher amounts were mere puffing. The court, however, rejected Herrera's argument that he should be held accountable for only 2 kilograms. The court also determined that Corral–Ibarra should receive a two-level increase as a manager or supervisor. Finally, the court declined to award Herrera a reduction for a "minimal" or "minor" role in the offenses.

· On appeal, Herrera raises four issues: (1) whether the evidence was sufficient to support his conspiracy conviction; (2) whether the district court erred in finding him accountable for 50 kilograms of cocaine; (3) whether the court erred in denying him a reduction for a "minimal" or "minor" role in the offenses; and (4) whether the court erred in denying him a downward adjustment for acceptance of responsibility. Corral–Ibarra only appeals the district court's denial of a downward adjustment for acceptance of responsibility.

## II.

### A.

An appellant who challenges the sufficiency of the evidence challenge used to convict him will fail if "after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir.1991). A defendant may be guilty of conspiracy either as an actual participant or as an aider and abettor, *United States v. Galiffa*, 734 F.2d 306, 310 (7th Cir.1984), and there is no need to distinguish between the two theories in the verdict. *United States v. Zafiro*, 945 F.2d 881, 884 (7th Cir.1991), *aff'd*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Aiding and abetting need not be specifically alleged in the indictment, and a defendant indicted

for a substantive offense may be convicted as an aider and abettor upon proper proof so long as no unfair surprise results. *United States v. Valencia*, 907 F.2d 671, 677 n. 5 (7th Cir.1990). Further, it is clear that one convicted as an aider and abettor may be punished with the same severity as a principal. 18 U.S.C. § 2(a); *United States v. Pino-Perez*, 870 F.2d 1230, 1233 (7th Cir.) (*en banc*), *cert. denied*, 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 209 (1989).

■ Here the government argued and the district court instructed the jury as to both theories under which Herrera could have been convicted of conspiracy. The jury returned a general verdict of guilty. Because Herrera's conviction will be upheld upon a finding of sufficient evidence on either theory, we will begin by examining the evidence supporting aiding and abetting liability. *See, e.g., Scroggins*, 939 F.2d at 421. To sustain a conviction for aiding and abetting a conspiracy, the record must show "substantial evidence"[3] that the defendant had "*knowledge* of the illegal activity that is being aided and abetted, a *desire* to help the activity succeed, and some *act* of helping." *Zafiro*, 945 F.2d at 887 (emphasis in original).

■ Herrera insists that the government's evidence was insufficient to prove that he knew of the criminal venture, which Herrera defines as an "attempt to purchase 50 kilograms of cocaine." Rep.Br. at 3. We note first that Herrera appears to misapprehend the well-established law of this circuit that the quantity of drugs involved in a conspiracy is not an element of the offense; rather, it is merely a sentencing factor unrelated to a defendant's underlying guilt. *United States v. Paiz*, 905 F.2d 1014, 1032–1033 (7th Cir.1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). Thus, the relevant question is whether the jury heard substantial evidence that Herrera had knowledge of a joint venture to obtain and distribute *some* amount of cocaine, even if not specified.

■ In this case, Herrera's own words clearly answer this question in the affirmative. In explaining why he wanted the government agents to cut the sealed kilogram packages, Herrera stated that "Frank and Johnnie" (a clear reference to Francisco Corral–Ibarra and John Castellanos) had told him to "cut it, rip it, taste it, good, then call, if not worth it, don't even bother to bring it over." Further, in his post-arrest statement, Herrera admitted that he was hired by John Castellanos to travel from Chicago to Quincy to test a quantity of cocaine, relay to Castellanos whether the cocaine was of sufficient quality, and, if so, to escort the sellers back to Chicago. At that time, Herrera also stated that he expected to be paid three to four thousand dollars for his services. Finally, even if (as is likely the case) Herrera was ignorant of the full scope of the proposed transaction, Herrera's conversation with Agent Miller suggests that Herrera understood that the deal involved more than just the two kilograms he had been shown. In our view, the foregoing statements unquestionably constitute substantial evidence that Herrera knew he was associated with a criminal venture to acquire and distribute a substantial amount of cocaine.[4]

■ Aiding and abetting involves two further elements: a desire to help the illegal activity succeed and some act toward that end. As explained in *Zafiro*, we require a desire to succeed in order "to identify, and confine punishment to, those forms of assistance the prevention of which makes it more difficult to carry on the illegal activity assisted." 945 F.2d at 887. In other words, on a continuum of assistance from integral to trivial, we wish to punish conduct tending toward the former, but not the latter. Here we think it clear that Herrera played a signifi-

---

3. In *United States v. Durrive*, 902 F.2d 1221, 1228 n. 5 (7th Cir.1990), we held that an appellate court "should review challenges to the sufficiency of evidence of a conspiracy's existence and an individual defendant's connection to the conspiracy under the same 'substantial evidence' standard we apply to sufficiency challenges in nonconspiracy criminal trials."

4. Proof of possession of substantial amounts of narcotics supports an inference that the possessor intended to distribute the drugs rather than to retain them for personal use. *United States v. Tanner*, 941 F.2d 574 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992).

cant, and perhaps essential, role in the attempted cocaine transaction. Indeed, Herrera's trip to Quincy was critical from the perspective of both the seller (who insisted on the "show and show" method) and the buyer (who would have aborted the deal had the cocaine been of inferior quality).[5] Those who "merely" test drugs or engage solely in counter-surveillance at drug transactions, *United States v. Pazos*, 993 F.2d 136, 139 (7th Cir.1993) (holding that engaging solely in counter-surveillance is sufficient to prove membership in a conspiracy to distribute drugs), are precisely the types of persons without whom the business of selling drugs would be more risky (because the chance of getting caught would increase) or less profitable (because of the likelihood of overpaying for low quality drugs would increase). Thus, the significant boost to illegal narcotics trafficking brought about by Herrera's knowing and voluntary facilitation of the deal strongly supports an inference that Herrera wanted it to succeed. Furthermore, Herrera's admission that Castellanos had promised to make the trip worth his while—to the tune of at least $3,000—also suggests that Herrera desired that the deal come to fruition. With respect to the act requirement, the evidence shows that Herrera meticulously followed his instructions to fly to Quincy, meet with the sellers, taste the cocaine, and inform Castellanos and Corral–Ibarra of the results of his test.

In sum, we conclude that the jury heard substantial evidence from which it could rationally conclude beyond a reasonable doubt that Herrera had aided and abetted the charged conspiracy. Because this conclusion alone is sufficient to uphold the verdict, we need not address whether Herrera was an actual member of that conspiracy.

**5.** While the record indicates that Castellanos initially saw no need to view the cocaine prior to the actual exchange of drugs and money, Herrera's recital of his instructions ("if not worth it, don't even bother to bring it over") clearly reveals that a negative report from Herrera could have nixed the deal.

**6.** The district court sentenced Herrera on July 26, 1991, properly using the Guidelines effective as of November 1, 1990. We review Herrera's

## B.

■ We next consider whether the district court correctly calculated the amount of cocaine attributable to Herrera under the Sentencing Guidelines.[6] A sentencing court's conclusion as to the amount of cocaine involved in an offense is a factual finding which we review for clear error. *United States v. Strauser*, 21 F.3d 194, 196 (7th Cir.1994) (citing *United States v. Cea*, 963 F.2d 1027, 1030 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992)). We will reverse the district court's quantity determination only if after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made. *Id.* (citing *United States v. Cagle*, 922 F.2d 404, 406 (7th Cir.1991).

■ Herrera contends that the district court erred in computing his sentence by holding him accountable for 50 kilograms of cocaine, an amount that he asserts was not reasonably foreseeable to him. Instead, Herrera maintains that he should be held accountable for only two kilograms,[7] pointing to "direct evidence from the mouth of an unsuspecting co-defendant who speaks candidly, without motive, as to the knowledge and agreement of another defendant." Br. at 16. This evidence, consisting of numerous statements by Castellanos to Agent Schaefer, convincingly demonstrates a strong likelihood that Herrera indeed was ignorant of the size of the transaction. At oral argument, the Assistant United States Attorney (who also had prosecuted the case) agreed that 50 kilograms may not have been foreseeable to Herrera and that, at least from the perspective of "just desserts", a sentence based on that amount is "highly questionable."

■ We likewise are persuaded that Herrera underestimated the full scope of the sentence under the Guidelines in effect at the time of sentencing. *See* 18 U.S.C. § 3742(e)(2); *United States v. Edwards*, 945 F.2d 1387, 1391 (7th Cir.1991), *cert. denied sub nom., Martin v. United States*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992).

**7.** If Herrera were correct, his base offense level would decrease from 36 to 28, reducing his sentence by over 50%.

deal, perhaps by a factor of ten or more. Unfortunately for Herrera, however, the quantity of drugs that was reasonably foreseeable to him is legally irrelevant to the computation of his base offense level under the applicable Sentencing Guidelines.[8] Section 1B1.3(a)(1) directs courts to determine the base offense level on the basis of "all acts and omissions committed or aided and abetted by the defendant, *or* for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction ... or that otherwise were in furtherance of that offense." (emphasis added). As explained in Application Note 1 to that section, reasonable foreseeability in the context of § 1B1.3(a)(1) applies only to conduct "for which the defendant would be *otherwise* accountable," and not to the preceding clause relating to "all acts and omissions committed or aided and abetted by the defendant." (emphasis added). Illustrations a. and e. to Application Note 1 even more clearly spell out this distinction:

> a. Defendant A, one of ten off-loaders hired by Defendant B, was convicted of importation of marihuana, as a result of his assistance in off-loading a boat containing a one-ton shipment of marihuana. *Regardless* of the number of bales of marihuana that he actually unloaded, *and notwithstanding any claim on his part that he was neither aware of, nor could reasonably foresee, that the boat contained this quantity of marihuana,* Defendant A is held accountable for the entire one-ton quantity of marihuana on the boat because he aided and abetted the unloading, and hence the importation, of the entire shipment.

> e. Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. For the purposes of determining the offense level under this guideline, Defendant J is accountable for the entire single shipment of marihuana he conspired

to help import *and* any acts or omissions in furtherance of the importation that were reasonably foreseeable. He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I *if* those acts were beyond the scope of, *and* not reasonably foreseeable in connection with, the criminal activity he agreed to jointly undertake with Defendants H and I. (*i.e.,* the importation of the single shipment of marihuana).

(Emphasis added). It follows from these detailed examples that the critical distinction is between direct and remote involvement in an illegal activity because only the latter will trigger a reasonable foreseeability inquiry.

On the facts of this case, we cannot avoid the conclusion that Herrera is in the same "boat" as the off-loader in Illustration a. above. By boarding the houseboat to test, in his own words, a "sample" of the cocaine and then verifying its adequacy over the telephone to Castellanos, Herrera played a direct, personal role in furtherance of the attempt to obtain and distribute a large quantity of cocaine. Like the off-loader, Herrera's actions sufficed to visit upon him criminal liability for the entire quantity of the shipment. The severity of the resulting sentence—between 188 and 235 months imprisonment—gives us pause in the circumstances of this case: Herrera is young, has no criminal history, and for all we know, may not even have had a whiff of the conspiracy prior to two days before his arrest. Indeed, we think this the type of case where a district judge might conclude that a considerably lighter sentence is warranted, but the Sentencing Guidelines foreclose such an exercise of discretion. The government, in recommending the minimum permissible sentence under the Guidelines, apparently shared our misgivings, but the district judge, as was his prerogative, chose to impose a sentence in the middle of the range.

### C.

▇▇▇ Herrera also contends that the district court erroneously denied him a re-

---

**8.** Reasonable foreseeability would have been a relevant factor under the pre-November, 1989 Guidelines.

duction in his offense level under § 3B1.2 of the Guidelines as a "minimal" or "minor" participant in the offenses for which he was convicted. As with the district court's quantity determination, we will reverse the denial of a downward adjustment under § 3B1.2 only if it was clearly erroneous. *United States v. Boyer*, 931 F.2d 1201, 1205 (7th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Rodgers v. Western–Southern Life Insurance Co.*, 12 F.3d 668, 676 (7th Cir.1993).

As this court recently stated, "[w]hether one is a minor or minimal participant or a plain vanilla criminal is answered by the facts of the case and there is no formulaic solution." *United States v. Kerr*, 13 F.3d 203, 206 (7th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1629, 128 L.Ed.2d 353 (1994). The Commentary to § 3B1.2 does give some guidance, indicating that the downward adjustment "will be used infrequently" in favor of "a defendant who plays a part in committing the offense that makes him *substantially* less culpable than the average participant." (emphasis added). Our cases indicate that comparative roles are an important, though not determinative, factor, *Kerr*, 13 F.3d at 206, and we have upheld the denial of a downward adjustment under § 3B1.2 where a less culpable defendant nevertheless played an "integral role" in the conspiracy. *United States v. Osborne*, 931 F.2d 1139, 1159 (7th Cir.1991).

In denying Herrera's request for a downward adjustment, the district court explained:

> [U]nder 3B1.1, Notes 1 and 2, an adjustment for a minimal role should only be given infrequently, and Mr. Herrera was aware of the general purpose of the conspiracy, that is, the purchase of cocaine, and was sufficiently knowledgeable and trustworthy that he was sent to test the merchandise and then to lead the seller back to Chicago.

> And I think that we covered that adequately to show that he was not a minimal participant at all. He was a very integral part of this enterprise. And, in fact, he was the bottom line. He was the one to go there and actually test and to see and to make sure it was in hand, that it wasn't just a fluke, before he carried through and brought them back.

Sent. Tr. at 13.

As in *Kerr*, we find that "the decision to deny minor offender status was not inevitable but it was reasonable." 13 F.3d at 206 (footnote omitted). Though it is true that Castellanos and Corral–Ibarra masterminded the proposed criminal transaction and brought Herrera into the picture only days before the actual exchange, "the fact that one plays a much lesser role than another does not mean that one is a minor participant." *Id.* Herrera was less culpable than his two cohorts, yet his conduct contributed crucially to the potential success of the enterprise. Viewing the totality of the evidence, we agree with government counsel's submission that reasonable minds could differ as to whether Herrera was a minor or minimal participant or just a routine criminal. Accordingly, the district court's decision to assess the usual punishment could not, and did not, constitute clear error.

### D.

The final issue is whether the district court erred in denying both defendants a two-level reduction in their sentences for acceptance of responsibility. Section 3E1.1(a) provides for a two-level reduction in the offense level "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." Subsections (b) and (c) make clear that a plea of guilty does not automatically entitle a defendant to the reduction, nor does a decision to go to trial automatically preclude it. 1990 Application Note 1 lists seven, non-exclusive factors to be considered, among them: (c) voluntary and truthful admission to authorities of involvement in the offense and related conduct, and (g) the timeliness of the defendant's conduct in manifesting the acceptance of responsibili-

ty. Application Note 2 expressly states that "[i]n *rare situations* a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial." (emphasis added). As the Commission noted, a defendant's decision to go to trial to assert an issue that does not relate to factual guilt, such as raising a constitutional challenge to a statute, may constitute a "rare situation." We find that an entrapment defense, if pleaded in good faith, also may possibly qualify. *See United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990). Nevertheless, even where a defendant has raised the specter of entrapment, "a determination that a defendant has accepted responsibility will be based *primarily* upon *pre-trial* statements and conduct." U.S.S.G. § 3E1.1 Application Note 2 (emphasis added).

■ Whether a defendant has accepted responsibility for his crimes is a factual question depending largely on the credibility assessment of the sentencing judge, *United States v. Salvador*, 18 F.3d 1380, 1381–1382 (7th Cir.1994); therefore, we will uphold a district court's finding as to whether a defendant has satisfied the criteria of § 3E1.1 unless clearly erroneous. *United States v. Beal*, 960 F.2d 629, 632 (7th Cir.), *cert. denied*, ‒‒ U.S. ‒‒, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992). Though "it is incumbent upon the trial court to provide an explanation of the factors it relied on in reaching its decision to enable this Court to fulfill its review function," we will affirm if there is "more than an adequate foundation in the record" to support the finding. *Id.* at 635; *United States v. Blas*, 947 F.2d 1320, 1330 (7th Cir.1991), *cert. denied*, ‒‒ U.S. ‒‒, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992). Both defendants submit that the district court

failed to articulate an adequate factual basis for the denial, and, alternatively, that the district court relied on improper factors in refusing the reduction.

### 1.

■ With respect to Herrera, these arguments are meritless and need not detain us long. "Any sentence under the Guidelines must be accompanied by a statement of 'reasons for [the] imposition of the particular sentence.'" *United States v. Himsel*, 951 F.2d 144, 147 (7th Cir.1991) (citing 18 U.S.C. § 3553(c)). In the ordinary case, we would expect the district court to address any and all colorable arguments raised by the defendant, stating clearly the reasons for accepting or rejecting the defendant's position. Here, however, the paucity of evidence supporting Herrera's claim to reduction for acceptance of responsibility made his an unusual case. It is not surprising, therefore, that the district court was unable to make a detailed statement of its reasons for rejecting Herrera's argument.[9]

■ In view of the scanty basis for Herrera's claim, we find that the district court offered an adequate explanation for its determination. As the court noted, Herrera refused to discuss the circumstances of the offense with the Probation Office, purportedly on the advice of counsel. Such a failure to cooperate with the sentencing court's efforts to gather information qualifies as "conduct ... inconsistent with ... acceptance of responsibility." *Beal*, 960 F.2d at 633 (citing U.S.S.G. § 3E1.1 (comment.) n. 3). Nevertheless, in his written objections to the proposed sentencing factors, Herrera maintained "that he can still accept responsibility and therefore be a candidate for a two-point

---

**9.** In denying the reduction for acceptance of responsibility, the district court stated:

> Now, in addition, at Paragraph 54, Mr. Herrera denies—I mean, he is denied two points for the acceptance of responsibility. Now, we went through that with Mr. Corral–Ibarra, and although Mr. Herrera says that he did not discuss this offense with the Probation Officer on advice of counsel and he still maintains that he is entitled to the reduction.
>
> But under 3E1.1, to be entitled to this two point benefit a Defendant must clearly demon-

strate a recognition and an affirmative acceptance of responsibility. And here he has done nothing to demonstrate any such acceptance. He insisted upon going to trial, which he did do, which was his right. And he entered a plea of not guilty, and he maintained that throughout the course of the trial. *And to this date, he maintains his innocence.*

And, thus, I think clearly that the two points for acceptance of responsibility cannot be awarded to Mr. Herrera....

Sent. Tr. at 13–14.

downward adjustment from the base offense level." Outside of this statement, however, there is no indication whatsoever on Herrera's part of an affirmative acceptance of responsibility for his criminal conduct, either in his written submissions or in the course of the sentencing dialogue. The only shred of evidence that might support an inference that Herrera accepted responsibility is the fact that his attorney argued the defense of entrapment at trial. However, even if raising an entrapment defense does not foreclose the possibility of receiving a reduction for acceptance of responsibility, *see Fleener*, 900 F.2d at 918, it remains the defendant's task to manifest in some way that he has in fact acknowledged the wrongfulness of his conduct. *See United States v. Emenogha*, 1 F.3d 473, 482 (7th Cir.1993) ("There is no basis for the contention that the simple assertion of an affirmative defense automatically entitles a defendant to a two-point reduction."). The raising of an entrapment defense, in and of itself, does not constitute either an acceptance of responsibility or an expression of remorse for one's criminal conduct. It may indicate that the defendant himself sincerely acknowledges the wrongfulness of his actions, or it may simply represent a tactical choice of counsel. Under § 3E1.1, the responsibility of indicating affirmatively that an assertion of an entrapment defense reflects the former, not the latter, lies with the defendant. Noting Herrera's complete failure to do so was all the explanation necessary for the court's denial of a downward adjustment under § 3E1.1 of the Sentencing Guidelines.

## 2.

█ The factor distinguishing (and strengthening) Corral–Ibarra's appeal from Herrera's is the existence of a letter from Corral–Ibarra's lawyer to his Probation Officer.[10] We must determine whether this distinction makes a difference.

We conclude that it does not, but we are troubled by the brevity of the district court's statement of reasons, especially with regard to the letter.[11] Early in the sentencing hearing, the court expressed the view that Corral–Ibarra did not merit a reduction for acceptance of responsibility because "to this day, [he] denies his guilt," apparently on the basis of Corral–Ibarra's statement to the probation officer. Sent. Tr. at 8. Later in the proceedings, in response to a question from the district judge, Corral–Ibarra's counsel noted "a further statement by the Defendant contained in that letter relative to his position on acceptance of responsibility in connection with his actions." *Id.* at 16. Counsel then asked that the letter be made part of the record, but added "[w]e don't have to elaborate here at sentencing since we have the right of allocution." *Id.* Subsequently, counsel asked the court to reconsider its decision in light of Corral–Ibarra's

---

10. The relevant paragraphs of the letter read:
Francisco Corral–Ibarra, by and through his attorney, Elliott T. Price, states that he accepts responsibility for his actions and the harm which they could have caused society, if his intentions had been carried forward, and the parties selling the drugs had in fact been for real and not government agents.

He asks that the fact that he asserted the defense of entrapment, which of its nature constitutes an admission of fact, but attempts to explain the circumstances causing defendant's behavior, not impair his ability to truly convince this Court, that notwithstanding the actions of government agents, he and he alone is ultimately responsible for having been involved in the commission of this offense. Rec. at 59.

11. The court stated its conclusions as follows:
... We'll address Mr. Corral–Ibarra's presentence report first. And that is with reference to Paragraph 48, which denied Mr. Corral–Ibarra a two-point reduction for acceptance of responsibility because during an interview with him, he told the probation officer that he still maintained his innocence.

And Mr. Corral–Ibarra argues that it is unconstitutional that a man who protests his innocence be denied an adjustment for acceptance of responsibility, especially when he has asserted entrapment and admitted the underlying conduct.

3E1.1 requires the Defendant to clearly demonstrate a recognition and affirmative acceptance of his responsibility in order to obtain that two point reduction.

Now, the defense of entrapment was rejected by the jury. And to this day, Mr. Corral–Ibarra denies his guilt. And he is clearly not entitled to a reduction for acceptance of responsibility in this Court's view. So consequently, the objection is denied. Sent. Tr. at 8.

letter to the probation officer. *Id.* at 17. The district judge agreed to read the relevant paragraphs, and upon doing so, indicated that he did not find them persuasive, though he did not say why. *Id.* at 18.

While some statement explaining why Corral–Ibarra's letter failed to satisfy the district court would have greatly facilitated our review, as noted above, we will uphold the court's finding if it is supported by "more than an adequate foundation in the record." *Blas,* 947 F.2d at 1330. Here, despite the absence of a complete statement of reasons by the district court, we affirm the denial of a two-level reduction for two principal reasons. First, we note that like Herrera, Corral–Ibarra failed to indicate any acknowledgment of the wrongfulness of his actions in connection with his entrapment defense. Second, we find that the timing of Corral–Ibarra's letter—the first arguable manifestation of an acceptance of responsibility—supports the denial of a reduction. *See Kerr,* 13 F.3d at 205 ("A defendant's failure to demonstrate truthfulness and remorse prior to 'the final hour' is certainly a factor upon which a judge might properly rely"); *United States v. Tolson,* 988 F.2d 1494, 1499 (7th Cir.1993) ("The reduction for a timely acceptance of responsibility was not adopted with the idea that a defendant might lessen his or her sentence with a last minute, formalistic demonstration of remorse after the government has been forced to expend a great deal of time and resources"). The Guidelines are clear that the determination that a defendant has accepted responsibility should turn "primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1, App. Note 2. Before trial, Corral–Ibarra utterly failed to show an acceptance of responsibility, either in words or actions, and the attempt to reduce his penalty through the letter is simply too little, too late. Indeed, paragraph three of the letter appears to hedge a bit, admitting that harm *could* have been caused *if* his intentions (presumably to distribute the cocaine) had been carried out, and *if* the government had not been the seller. In other words, the letter, by itself, does not help Corral–Ibarra much. We are aware that English is not Corral–Ibarra's native tongue, and in no way disparage his decision to speak through counsel,

but we nevertheless think he may have presented a stronger argument for the reduction if he had exercised his right to allocution and stated, through an interpreter if necessary, a *clear and unequivocal* acceptance of responsibility. He did not do so at sentencing, or anywhere else on the record. Accordingly, we conclude that the record more than adequately supports the district court's denial of a two-level reduction for acceptance of responsibility.

AFFIRMED.