**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Erwin VELASQUEZ and Edward Walkowiak, Defendants– Appellants.**

Nos. 93–3107, 93–3108.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1995.

Decided Oct. 12, 1995.

Rehearing Denied Dec. 6, 1995.

Patrick S. Layng, Asst. U.S. Atty., George Jackson (argued), Office of the United States Attorney, Criminal Division, and Barry Rand Elden, Asst. U.S. Atty., Chicago, IL, for Plaintiff–Appellee.

Michael D. Ettinger, Barry S. Pechter (argued), Ettinger & Pechter, Palos Hills, IL, and Sharon G. Kramer (argued), Chicago, IL, Terence MacCarthy, Federal Public Defender, Chicago, IL, for Defendants–Appellants.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Erwin Velasquez and Edward Walkowiak were convicted of conspiring to possess cocaine with the intent to distribute. The district court sentenced Velasquez and Walkowiak to 135 months and 168 months of impris-

onment respectively. Each challenges his conviction and sentence, and we affirm the district court in all respects.

## Factual Background

On June 3, 1992, Nathanial Romeo agreed to sell Fernando Martinez five kilograms of cocaine for $105,000. Unbeknownst to Martinez, Romeo was a sergeant with the Will County Sheriff's Department, and the transaction was actually a "reverse buy" sting set up by the Drug Enforcement Administration with the cooperation of various state and local law enforcement agencies. Sergeant Romeo met with Martinez in the parking lot of a K-Mart in New Lenox, Illinois. Martinez was in a van, and Sergeant Romeo entered the van to begin the transaction. Sergeant Romeo was wearing a transmitter (wire), through which his conversations with Martinez were monitored and recorded.

Martinez and Sergeant Romeo agreed that the cocaine would be delivered to the van and the money would be delivered at a separate location. Sergeant Romeo then called Sheriff's Investigators Jeannette Montgomery and Edward Jordan, who were posing as partners of Sergeant Romeo, and instructed them to deliver the cocaine to the van. Once the cocaine was delivered, Martinez inspected two of the five packages. Satisfied with what he saw, Martinez, by phone, instructed his coconspirators to deliver the money to Investigators Montgomery and Jordan at the Hardees Restaurant in New Lenox. Martinez then told Sergeant Romeo that "they don't like New Lenox" and that a new drop point was needed.[1] Martinez and Sergeant Romeo decided on a greenhouse on Gougar Road, in Joliet, Illinois. Sergeant Romeo instructed Investigators Montgomery and Jordan to drive to the greenhouse and wait for the money.

After killing some time, Martinez again spoke with the people that were to drop the money. Martinez told Sergeant Romeo that his people had driven by the greenhouse but did not know to whom they were to deliver

the money. Sergeant Romeo called Inspector Montgomery and told her to stand beside her car. Inspector Montgomery informed Sergeant Romeo that she and Inspector Jordan had seen a grey station wagon drive by. Upon learning this, Martinez told Sergeant Romeo that his people might be driving such a car. Martinez then relayed a description of Inspector Montgomery to the person on the other end of the line, whom he called "Ed."

At about this time, Velasquez and Walkowiak arrived in a grey station wagon at the parking lot of the greenhouse. Walkowiak was driving, and he began to drive up to Investigator Montgomery. Suddenly, the station wagon sped out of the parking lot. Inspectors Montgomery and Jordan gave chase in their car, as did other officers who were conducting surveillance. Following a lengthy chase, in which the defendants sped through residential areas, weaving in and out among pedestrians, the defendants were arrested after pulling into a gas station. Inside the station wagon, officers recovered $125,120, most of which was in an unsealed garbage bag lying on the floorboard behind the driver's seat.

At the same time as the defendants sped away from the greenhouse, Martinez received a phone call and asked the caller, "How do you know she's a cop?" Sergeant Romeo then gave a prearranged arrest signal, at which time officers who had the K-Mart parking lot under surveillance arrested Martinez.

After being transported to the Will County Sheriff's Task Force Office, Velasquez gave an oral statement to DEA Special Agents Mark Hunter and Todd Edwards. Agent Hunter testified that "Velasquez stated that he was requested to go to a park in Joliet" and that "he was going for someone to sell drugs. He further stated that he thought the deal was for one or two ounces of cocaine or maybe a pound of marijuana and that he didn't know the deal was for five kilograms of cocaine." Agent Hunter also testified that Velasquez "said that he was going to receive

---

1. Sergeant Romeo, of course, could not hear the other side of Martinez's phone conversations and the authorities did not procure a wire tap of the phone. Therefore, all evidence of what was said on the other end of the conversations was from Martinez's explanations to Sergeant Romeo at the time.

some money for this and he also told me that a female by the name of Yesevia Salazar was involved, but not arrested."

### Sufficiency of the Evidence

■ Velasquez and Walkowiak each claim that the evidence adduced at trial was insufficient to prove that he was a member of the conspiracy. They shoulder a very heavy burden. As the jury found both Velasquez and Walkowiak guilty, we view the evidence in the light most favorable to the government, making all reasonable inferences in its favor. *United States v. Rosalez–Cortez,* 19 F.3d 1210, 1215 (7th Cir.1994).

Velasquez first argues that he was merely present at the scene of the crime but was not involved in the illegal activity. This argument is belied by his confession; he admitted that he was being paid to be involved in a drug transaction. In a similar vein, he asserts that he had insufficient knowledge to be part of the conspiracy, citing *United States v. Smith,* 26 F.3d 739 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 680, 130 L.Ed.2d 612 (1994).

■ In *Smith,* we stated that the defendant "could not have joined the conspiracy unless he knew about it." *Id.* at 746. The government must prove that the defendant intended to further the conspiracy's goals. *Id.* at 744. But the jury heard sufficient evidence to conclude that Velasquez was a knowing participant in the conspiracy.

Velasquez stated to Special Agent Hunter that he knew he was going to participate in a drug transaction, that he was to be paid, and that he knew the identity of another conspirator, Yesevia Salazar,[2] in addition to Walkowiak. Moreover, Velasquez showed up at the appointed time, in the appointed place, riding in the appointed vehicle, with the correct amount of money for the transaction. This was sufficient evidence for the jury to convict Velasquez of knowingly participating in and furthering the goals of the conspiracy.

■ Walkowiak also attacks the government's evidence of his knowing participation

in a conspiracy to possess drugs. He makes the disingenuous argument that although he knew he was to deliver in excess of $100,000 to someone, the government failed to prove that he knew that it was for drugs. But the government introduced evidence that during the negotiations between Sergeant Romeo and Martinez, phone calls were made between the cellular phone that was seized in the grey station wagon driven by Walkowiak and Martinez's cellular phone.

Sergeant Romeo also testified that at one point Martinez "instructed someone that he had just received the five kilograms of cocaine and for them to now deliver the money." Furthermore, during another call to the cellular phone found in the vehicle driven by Walkowiak, Martinez called the person on the other end of the line "Ed." The jury could reasonably infer that Edward Walkowiak was on the other end of the conversation with Martinez, and therefore Walkowiak knew of the nature of the transaction.

■ Finally, both Velasquez and Walkowiak argue that the government did not prove beyond a reasonable doubt that they had the requisite intent to distribute cocaine. They claim that, at most, the government merely proved that they conspired to possess cocaine, but had insufficient knowledge of any plans to distribute the cocaine. But a jury may infer an intention to distribute from the size of the transaction. *See, e.g., United States v. Hernandez,* 13 F.3d 248, 252 n. 1 (7th Cir.1994). In this case, Velasquez and Walkowiak were to deliver $105,000 in exchange for five kilograms of drugs. This is more than a sufficient amount to allow the jury to infer an intention to distribute. *See United States v. Smith,* 34 F.3d 514, 523–24 (7th Cir.1994) (approximately one kilogram of cocaine); *United States v. Saunders,* 973 F.2d 1354, 1360 (7th Cir.1992) (thirteen ounces, or approximately 370 grams, of cocaine), *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993); *United States v. Tanner,* 941 F.2d 574, 587 (7th Cir.1991) (approximately 55.5 grams of cocaine), *cert.*

---

**2.** Yesevia Salazar was not indicted, and we do not know what role she played in the conspiracy. Nonetheless, that Velasquez knew of her partic-

ipation in the conspiracy evinces an increased level of knowledge of the conspiratorial design.

*denied,* 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992).[3]

■ Velasquez argues that the district court improperly denied his motion for a new trial. His motion was based on the argument that the government's proffer in the *Santiago* hearing, *see United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978), was insufficient to show his participation in the conspiracy for the purpose of admitting co-conspirators' statements under Fed.R.Evid. 801(d)(2)(E). This argument is akin to his claim that there is a lack of sufficient evidence to support the conviction. The government's proffer in the *Santiago* hearing met the preponderance of the evidence test. The postarrest statement of Velasquez admitting his participation in the conspiracy was enough, standing alone, to meet the government's burden. Therefore, there was no clear error by the court in determining that Velasquez participated in the conspiracy for the purpose of admitting coconspirators' statements under Fed.R.Evid. 801(d)(2)(E). Consequently, Velasquez's motion for a new trial was properly denied.

### Sentencing

■ Velasquez and Walkowiak each argue that the district court erred in calculating their base offense levels based on five kilograms of cocaine. They argue that such an amount was not reasonably foreseeable to them. However, as the government points out, reasonable foreseeability is irrelevant when the defendant was a direct participant in the relevant transaction. *United States v. Corral–Ibarra,* 25 F.3d 430, 438 (7th Cir. 1994); *see also* United States Sentencing Guidelines § 1B1.3 Application Note 1(a)(1). Reasonable foreseeability is relevant to United States Sentencing Guidelines

§ 1B1.3(a)(1), concerning a defendant's responsibility for the actions of coconspirators. Velasquez and Walkowiak were direct participants, in that they were delivering the purchase price for the drugs. Under Application Note 12 to § 2D1.1, "[i]n an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." The negotiation was for five kilograms of cocaine, and, therefore, the district court correctly used that amount to determine the defendants' offense levels.

■ Walkowiak also claims that the district court erred in refusing to decrease his offense level as a minimal participant under Guidelines § 3B1.2(a).[4] We review the district court's decision deferentially. *Corral–Ibarra,* 25 F.3d at 439. The district court did not err. Walkowiak, together with Velasquez, was responsible for delivering the money to purchase the cocaine. He attempted to warn Martinez that the police were involved, and he also attempted to protect himself and Velasquez from arrest and the money from seizure by fleeing. Walkowiak was not substantially less culpable than the other conspiracy participants. *See United States v. Kerr,* 13 F.3d 203, 206 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1629, 128 L.Ed.2d 353 (1994).

■ Walkowiak's final argument on appeal is that the district court erred in adjusting upward his offense level for reckless endangerment under Guidelines § 3C1.2. Again, we review the district court's decision deferentially. *United States v. Chandler,* 12 F.3d 1427, 1433 (7th Cir.1994). Section 3C1.2 states that "[i]f the defendant recklessly created a substantial risk of death or

---

**3.** Velasquez claims that the government did not prove that he knew either the amount of drugs involved or the amount of money that he was delivering. He claims that the only evidence introduced by the government related to his agreement to be paid to accompany Walkowiak to a drug transaction for a couple of ounces of cocaine or a pound of marijuana. However, the jury was entitled to disbelieve Velasquez's statement that he thought the transaction was for a small amount of drugs. Moreover, $105,000 was in an unsealed garbage bag in the backseat of the

station wagon. The jury could reasonably infer that Velasquez was aware of the size of the transaction.

**4.** Velasquez makes a similar claim stating only that he should be allocated a four-point reduction under § 3B1.2(a) for minimal participation because "[t]he facts support that reduction." They do not. As the district court properly found, Velasquez's role in the offense was minor, not minimal.

serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels." Evidence was introduced at trial that Walkowiak fled the scene at a high rate of speed (one officer had to drive between sixty and seventy miles per hour to catch up) through residential neighborhoods. Such evidence is sufficient to support the district court's decision.

## Conclusion

The convictions and the sentences for Velasquez and Walkowiak are AFFIRMED.