**UNITED STATES of America, Plaintiff–Appellee,**

v.

**J.W. PEARSON, a/k/a David Porter, and Gregory P. Scott, Defendants–Appellants.**

Nos. 95–3204, 95–3211.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1997.

Decided May 14, 1997.

Rehearing Denied June 17, 1997.

Robert H. Aronson (argued), Chicago, IL, for Defendant–Appellant in No. 95–3204.

Roy P. Amatore, Chicago, IL, Kevin E. Milner, Palatine, IL, for Defendant–Appellant in No. 95–3211.

Before POSNER, Chief Judge, and ESCHBACH and MANION, Circuit Judges.

MANION, Circuit Judge.

Defendants J.W. Pearson (hereinafter "David Porter," the name used by the parties) and Gregory Scott were partners in a small construction business in Chicago named Unity Contracting. Debra Pool and Michael Brooks were partners in a cocaine distribution ring in Springfield, Illinois. Pool and Brooks testified at the trial of Porter and Scott. Their testimony revealed a long-standing drug-purchasing relationship in which they would telephone Porter from Springfield and tell him they needed drugs. They then would drive to Chicago to purchase the drugs from Porter, who was assisted by Scott. A jury convicted Porter and Scott of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846. Porter was sentenced to 188 months of imprisonment; Scott was sentenced to 97 months. Both appeal their convictions; Porter also appeals his sentence. We affirm.

## I.

Pool met Porter while she was purchasing drugs from another supplier in Chicago. Those drugs were delivered to her one day by Porter. Soon after meeting Porter, Pool started to page him directly for drugs. Porter supplied cocaine, generally in kilogram quantities (in excess of $20,000 per purchase) to Pool and Brooks, with only a few interruptions, from early 1992 until October 25, 1994. They would arrange for drug transactions approximately two or three times each month, and sometimes once a week. Over time, Pool, Brooks and Porter developed a set routine to minimize their transaction costs as well as their risk. Pool would page Porter from Springfield, and he would call back and let her know if she could come to Chicago to purchase the drugs. Once in

David E. Risley (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee in Nos. 95–3204, 95–3211.

Chicago, Pool would page Porter from a pay telephone at 100th & Halsted on the South Side in front of a tire business by the name of "Joy Service Auto." Porter would show up and take their money. Pool and Brooks then would go out shopping or eat lunch; when they were ready to leave, they would page Porter again and he would deliver the cocaine.

Pool testified that in summer 1993 Porter introduced her to a friend named "Greg," whom she identified at trial as Scott. During one of their drug transactions, Porter brought Scott along and told Pool to give the money directly to Scott. Consistent with their routine, Porter and Scott left with the money and later returned with the drugs. When they returned, Scott was the person who handed the cocaine to Pool. Pool saw Scott a second time a few months later when he again accompanied Porter and again handed her the drugs.

In August 1993, Brooks started an unrelated prison sentence for selling drugs. Pool still wanted company on her trips to Chicago, so generally she brought along two friends, Delisha Wallace and Leotis McDowell, both of whom testified against Porter and Scott at trial. Wallace became a DEA informant in August 1993. Between September 7, 1993 and April 1994, she made 15 trips to Chicago with Pool to purchase cocaine. She reported each of these trips to her supervising DEA agent. During one trip, a DEA agent followed her without making any arrests. At trial, Wallace identified Porter as her source of cocaine.

On October 24, 1994, Porter called Pool and said he had cocaine available. Brooks (then out of prison) and Pool decided to send McDowell to Chicago to pick up the drugs. The next day, Pool gave McDowell $23,000 wrapped in a shirt to buy a kilogram. McDowell put the money in his bag and took the train to Chicago; Pool went home.

When she got home, Pool paged Porter, and Scott called her back. Pool told Scott that "Ol' Boy" (referring to McDowell) was on his way up. Scott asked what he would be getting. Pool replied, "The whole thing." Scott said all right, and their conversation ended.

DEA agents followed McDowell on the train and into Chicago. They watched as he went to 100th & Halsted and used the pay phone in front of Joy Service Auto. Telephone company records reveal a call from Unity Contracting to the pay phone at 2:54 p.m.; six minutes later, a Honda Prelude left Unity and met McDowell on the corner. McDowell got into the car, which drove away. Agents followed. Once the car pulled into a shopping mall parking lot, agents closed in and arrested the occupants. McDowell was in the passenger seat; Scott was the driver. Scott had a .22 magnum revolver in his pants pocket. The agents also recovered $22,850 in currency wrapped in a shirt and placed on the floorboard of the car.

At trial, McDowell testified about his drug transactions on behalf of Brooks and Pool. He had made about seven trips to Chicago to buy drugs from a man he knew as "Jake." He identified Porter in court as Jake. McDowell explained that on October 25th, the day of the arrests, he had paged Porter from the pay telephone in front of Joy Service Auto. Porter called back and said he was busy, but that he would send his "son" to pick up McDowell. Five to ten minutes later, a blue Honda pulled up driven by Scott. When Scott learned McDowell needed an entire kilogram, he told McDowell that he would have to pick up some more drugs. McDowell decided to go to the mall in the interim and wait for Scott to get the drugs.

Shortly after Scott and McDowell were arrested, Porter was arrested at Unity Contracting. At Porter's detention hearing in Springfield, Scott testified that he had known Porter for 20–25 years, and added "he has treated me like a son."

## II.

■ The primary issue on appeal is whether sufficient evidence supported the convictions of Porter and Scott. Each was found guilty of conspiracy to distribute cocaine, though the government argued that Scott may have aided and abetted the conspiracy. This presents a legal distinction without significance here because a defendant indicted for a substantive offense may

be convicted as an aider and abettor and even punished with the same severity as a principal. *United States v. Corral–Ibarra,* 25 F.3d 430, 435–36 (7th Cir.1994).[1] When considering a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Porter's principal argument is that he never agreed with anyone to distribute cocaine. He contends that he was involved in mere "hand to hand" sales of narcotics to Pool and Brooks and nothing more. If true, then we would have to reverse Porter's conviction because "[w]hat is necessary [to sustain a conspiracy conviction] is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *United States v. Lechuga,* 994 F.2d 346, 347 (7th Cir.1993) (*en banc*); *see also United States v. Garcia,* 89 F.3d 362, 365 (7th Cir.1996). Therefore, we "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," *Jackson,* 443 U.S. at 318, 99 S.Ct. at 2788–89, despite Porter's claim that, at most, he made isolated sales of cocaine to the same individuals over nearly a three-year period without entering into a conspiracy to distribute the cocaine he sold.

■ In reviewing the record, we are looking for evidence of "a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture." *United States v. Clay,* 37 F.3d 338, 341 (7th Cir. 1994). Over the years, we have refined our calculus and have identified a few factors more relevant than others in determining whether a conspiracy existed: "for example the length of the affiliation, the established method of payment . . . the extent to which

the transactions are standardized, and the demonstrated level of mutual trust." *Id.* at 342. No one factor is dispositive, but "[i]f enough point in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals themselves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture." *Id.*

■ In this case, the evidence is one-sided that Porter conspired with Pool and Brooks to distribute the drugs he sold. It is true that the group operated in cash (as opposed to credit, which necessarily would imply that subsequent sales of the drugs would pay for their initial purchase), and that Porter and Scott apparently never went to Springfield to help Pool and Brooks distribute the drugs there. But over the course of nearly three years, the group appeared to enjoy the fruits of a conspiracy. They lowered their transaction costs by dealing principally with each other; they established a modus operandi to limit the time they were on the telephone and the time they were seen together; they transacted drugs on a monthly basis, and sometimes even on a weekly basis; in every sense, their transactions were "standardized" (e.g., Pool's calls to Porter from Springfield and then again once in Chicago, always from the same location at 100th & Halsted); and their "level of mutual trust" is demonstrated by the fact that Pool and Brooks typically paid many thousands of dollars for the drugs and then went shopping before actually receiving the cocaine. By the end, Porter had agreed with Pool to distribute the drugs to Wallace and, lastly, McDowell, both of whom routinely substituted for Pool. In the jury's eyes, this was more than sufficient to establish the Porter–Pool conspiracy.

■ Scott apparently stood by Porter as his trusted helper. He definitely was personally involved. According to Pool, Porter introduced Scott to her in the summer of 1993, and during two transactions that sum-

---

1. We therefore need not spend any time on Scott's contention that he was charged with conspiracy but improperly found guilty of aiding and abetting. We must uphold the jury's verdict—a general one not distinguishing between guilt by

virtue of being an actual participant in a conspiracy or an aider and abettor—so long as the record reveals Scott participated in the conspiracy to distribute cocaine in either manner. *Corral–Ibarra,* 25 F.3d at 436.

mer Scott was the one who actually received the money and handed the cocaine to Pool. This timeline means that Scott was involved for over one year before he was arrested. While Porter was the point man for most of the transactions, Scott was a dependable stand-in. For example, when Pool paged Porter on the day of the arrests, Scott, not Porter, called back. When Pool told Scott that the "Ol' Boy" was on his way to Chicago, Scott appeared to know exactly what that meant. He even knew enough to ask how much the Ol' Boy (McDowell) would be picking up. And when later that day McDowell paged Porter from the pay telephone, Porter called back and said he was busy but that his "son" would pick up McDowell. Five minutes later, Scott did just that.

This is enough evidence to establish that Scott agreed with Porter to distribute cocaine to McDowell, or at least agreed with Pool to do so. Such an agreement makes Scott a conspirator to distribute cocaine. At the very least, it shows that Scott aided and abetted Porter and Pool in *their* conspiracy through his dependable assistance. *See* 18 U.S.C. § 2(a). As we have noted, "[y]ou can assist an enterprise and want it to succeed without being a party to the agreement under which the enterprise was created or is being operated." *United States v. Ortega,* 44 F.3d 505, 506 (7th Cir.1995). So long as Scott knew that Porter was doing something illegal (selling drugs), and "did what he could do or what he was asked to do to help make [Porter's] success more likely," *id.* at 508, then Scott is an aider and abettor under the law. *Id.* Here, Scott personally handled the drugs and did whatever Porter asked of him. Sometimes that involved calling Pool in Springfield to set up a Chicago sale; at other times it involved handling the sale in Chicago on his own. Whatever Scott's motivation in helping Porter (perhaps personal, as he referred to Porter as "like a father"; perhaps pecuniary), Scott answered Porter's call. "No more is required to make the defendant guilty of joining the principal's venture and adopting its aims for his own." *Id.*

■ The defendants raise a number of ancillary issues that do not require much attention. Scott argues that the district court erred by not instructing the jury that the sale of "large quantities of controlled substances, without more, cannot sustain a conspiracy conviction." *Lechuga,* 994 F.2d at 347. The district court accurately defined "conspiracy" to the jury and further instructed that "[a] conspiracy to distribute cocaine requires an agreement to distribute the cocaine beyond the immediate buyer and seller." This is sufficient to make Scott's point and it is probably closer to the holding of *Lechuga* than Scott's proposed instruction.

■ Porter contends that the judge should have ordered a mistrial after the prosecutor announced at the end of his closing argument that the defendants were "guilty as charged." We agree with the district court that the prosecutor's remark was a comment upon what the evidence revealed, not a statement of his personal opinion regarding the defendants' guilt. The remark was made at the conclusion of the prosecutor's closing argument, after he had summarized the evidence against Porter and Scott. "We decline to adopt the defendant's curious view that it is improper for the prosecutor to argue to the jury that a defendant is guilty." *United States v. Auerbach,* 913 F.2d 407, 418 (7th Cir.1990).

■ This leaves us with Porter's contention that he is a victim of a "delayed arrest," and that the government chose not to arrest him earlier in order to ratchet up his sentence under the Guidelines. This is a sentencing manipulation defense, which we have held does not exist in this circuit. *United States v. Garcia,* 79 F.3d 74, 76 (7th Cir.1996). We have no interest in micromanaging law enforcement's criminal investigations and its arrests of suspected drug conspirators. Perhaps the government needed "additional time to understand [Porter's] operation and gather information on [a] co-conspirator." *Id.* Perhaps not. We need not worry ourselves as to the exact reason the government arrested Porter when it did because "the Constitution does not protect a criminal from himself by requiring the government to arrest the criminal before he commits another crime." *Id.*

AFFIRMED.